# Nos. 15-1451 & 15-1760

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### EDRO CORPORATON d/b/a DYNAWASH

**Petitioner/Cross-Respondent**

**v.**

### NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

_____

## ON PETITION FOR REVIEW AND CROSS-APPLICATION
## FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD

_____

**JULIE BROIDO**
*Supervisory Attorney*

**MICHAEL HICKSON**
*Attorney*

*National Labor Relations Board*
**1015 Half Street SE**
**Washington, DC 20570**
**(202) 273-2996**
**(202) 273-2985**

**RICHARD F. GRIFFIN, JR**
*General Counsel*
**JENNIFER ABRUZZO**
*Deputy General Counsel*
**JOHN H. FERGUSON**
*Associate General Counsel*
**LINDA DREEBEN**
*Deputy Associate General Counsel*

**National Labor Relations Board**

# **TABLE OF CONTENTS**

**Headings**                                                                                                    **Page(s)**

Statement of subject matter and appellate jurisdiction ...............................................1

Statement of the issues.................................................................................................2

Statement of the case...................................................................................................3

I.    Procedural history.................................................................................................3

II.   The Board's findings of fact .................................................................................3

     A.   The Company's operations and organizational structure .........................3

     B.   The Company contracts with Westaff to refer candidates for its quality inspector position; the Company selects Davis for the position and he begins work...............................................................................................4

     C.   Davis has a disagreement with President Kirejczyk about holiday pay; the Company decides to evaluate his performance ....................................5

     D.   Davis contacts the Union and attempts to organize his coworkers............6

     E.   The Company gives Davis a positive performance evaluation; within hours, it discharges him because of his union activity; several days later, the Company learns of Davis's criminal record...............................6

III.  The Board's conclusions and order....................................................................8

Summary of argument...................................................................................................9

Argument......................................................................................................................11

     I.  The Court should summarily uphold the Board's uncontested finding that the Company violated Section 8(a)(3) and (1) of the Act by discharging Davis for his union activity .....................................................11

i

# TABLE OF CONTENTS

**Headings-Cont'd**         **Page(s)**

II. The Board acted within its broad remedial discretion in ordering the Company to reinstate Davis and make him whole.....................................13

 A. Applicable principles and standard of review .....................................13

 B. The Board reasonably found that the Company was an employer of Davis and properly ordered it to reinstate him ...............................14

 C. The after-acquired evidence concerning Davis's criminal record did not compel the Board to limit the remedy ....................................19

Conclusion ........................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**  **Page(s)**

*10 Ellicott Square Court Corp.,*
  320 NLRB 762 (1996), *enforced,*
  104 F.3d 354 (2d Cir. 1996) ............................................................. 20

*ABF Freight Sys., Inc. v. NLRB,*
  510 U.S. 317 (1994)................................................................... 13, 19

*Berkshire Farm Ctr. & Servs. for Youth,*
  333 NLRB 367 (2001) ..................................................................... 20

*Beverly California Corp.,*
  339 NLRB 776 (2003) ..................................................................... 25

*Briar Crest Nursing Home,*
  333 NLRB 935 (2001) ..................................................................... 21

*CF Taffe Plumbing Co., Inc.,*
  357 NLRB No. 165, 2011 WL 7427787 (Dec. 30, 2011) .................................... 21

*D&F Indus., Inc.,*
  339 NLRB 618 (2003) ........................................................... 17, 18, 19

*Elec. Contractors, Inc. v. NLRB,*
  245 F.3d 109 (2d Cir. 2001) ......................................................... 12, 13

*Fibreboard Paper Prods. Corp. v. NLRB,*
  379 U.S. 203 (1964)........................................................................ 13

*Frazier Indus. Co. v. NLRB,*
  213 F.3d 750 (D.C. Cir. 2000).......................................................... 20, 25

*G & T Terminal Packaging Co. Inc. v. NLRB,*
  459 F. App'x 19 (2d Cir. 2012) ........................................................... 17

*Hadco Aluminum & Metal Corp.,*
  331 NLRB 518 (2000) ..................................................................... 21

iii

**Cases-Cont'd**                                                    **Page(s)**

*Huck Store Fixture Co.,*
  334 NLRB 119 (2001), *enforced,*
  327 F.3d 528 (7th Cir. 2003) ................................................................ 18

*LoSacco v. City of Middletown,*
  71 F.3d 88 (2d Cir. 1995) ............................................................. 12, 22

*Mgmt. Training Corp.,*
  317 NLRB 1355 (1995) ...................................................................... 15

*Mohave Elec. Co-op., Inc. v. NLRB,*
  206 F.3d 1183 (D.C. Cir. 2000)................................................. 19, 20, 25

*Mojave Elec. Coop., Inc.,*
  327 NLRB 13 (1998), *enforced,*
  206 F.3d 1183 (D.C. Cir. 2000)........................................................... 20

*NLRB v. Am. Geri-Care, Inc.,*
  697 F.2d 56 (2d Cir. 1982) ............................................................ 14, 23

*NLRB v. Better Val-U Stores of Mansfield, Inc.,*
  401 F.2d 491 (2d Cir. 1968) ............................................................... 17

*NLRB v. Consol. Bus Transit, Inc.,*
  577 F.3d 467 (2d Cir. 2009) ....................................................... 12, 13, 14

*NLRB v. E.C. Atkins & Co.,*
  331 U.S. 398 (1947)........................................................................... 15

*NLRB v. Int'l Van Lines,*
  409 U.S. 48 (1972)............................................................................ 17

*NLRB v. Little River Band of Ottawa Indians Tribal Gov't,*
  788 F.3d 537 (6th Cir. 2015) .............................................................. 14

*NLRB v. S.E. Nichols, Inc.,*
  862 F.2d 952 (2d Cir. 1988) ............................................................... 11

iv

**Cases-Cont'd**                                                    **Page(s)**

*NLRB v. Thalbo Corp.,*
  171 F.3d 102 (2d Cir. 1999) ................................................................. 14

*NLRB v. Young Women's Christian Ass'n of Metro. St. Louis,*
  192 F.3d 1111 (8th Cir. 1999) ............................................................. 15

*Phelps Dodge Corp. v. NLRB,*
  313 U.S. 177 (1941)............................................................................. 17

*Recana Solutions,*
  349 NLRB 1163 (2007) ................................................................. 15, 16

*Skill Staff of Colorado,*
  331 NLRB 815 (2000) .......................................................................... 18

*Sure-Tan, Inc. v. NLRB,*
  467 U.S. 883 (1984)............................................................................. 13

*Tel Data Corp.,*
  315 NLRB 364 (1994), *enforced in relevant part,*
  90 F.3d 1195 (6th Cir. 1996) ......................................................... 19, 20

*Torrington Extend-A-Care Employee Ass'n v. NLRB,*
  17 F.3d 580 (2d Cir. 1994) ............................................................ 11, 12

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951)............................................................................. 13

*Vemco, Inc.,*
  314 NLRB 1235 (1994), *enforcement denied on other grounds,*
  79 F.3d 526 (6th Cir. 1996) ................................................................. 18

*Verizon,*
  350 NLRB 542 (2007) ................................................................... 15, 16

*Virginia Elec. & Power Co. v. NLRB,*
  319 U.S. 533 (1943)....................................................................... 13, 19

**Cases-Cont'd**                                                            **Page(s)**

*Woelke & Romero Framing, Inc. v. NLRB,*
  456 U.S. 645 (1982)................................................................... 11, 12, 22

**Statutes**

National Labor Relations Act
  (29 U.S.C. § 151 et seq.)

Section 2(2) (29 U.S.C. § 152(2))........................................................ 14
Section 8(a)(1) (29 U.S.C. § 158(a)(1)) .................................... 2, 3, 8, 9, 11, 12, 17
Section 8(a)(3) (29 U.S.C. § 158(a)(3))............................... 2, 3, 8, 9, 11, 12, 16, 17
Section 10(a) (29 U.S.C. § 160(a)) ...................................................... 2
Section 10(c) (29 U.S.C. § 160(c)) ..................................................... 13
Section 10(e) (29 U.S.C. § 160(e)) ..................................... 2, 11, 12, 13
Section 10(f) (29 U.S.C. § 160(f)) ....................................................... 2

**Rules**

Fed. R. App. P. 28(a)(8)................................................................. 12

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

### Nos. 15-1451 and 15-1760
_____

## EDRO CORPORATION d/b/a DYNAWASH

**Petitioner/Cross-Respondent**

**v.**

## NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

_____

## ON PETITION FOR REVIEW AND CROSS-APPLICATION
## FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

_____

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

This case is before the Court on the petition of EDRO Corporation d/b/a

Dynawash ("the Company") to review, and the cross-application of the National

Labor Relations Board to enforce, a final Board Decision and Order (362 NLRB

No. 53) issued against the Company on March 31, 2015.  (A. 278-87.)[1]  The Board
had subject matter jurisdiction over the proceeding under Section 10(a) of the
National Labor Relations Act, as amended (29 U.S.C. §§ 151, 160(a)) ("the Act"),
which empowers the Board to prevent unfair labor practices affecting commerce.

The Company's petition for review and the Board's cross-application for
enforcement were timely; the Act imposes no time limits on the institution of
proceedings to review or enforce Board orders.  The Board's Order is final with
respect to all parties.  The Court has jurisdiction over this case pursuant to Section
10(e) and (f) of the Act (29 U.S.C. § 160(e) and (f)) because the unfair labor
practice occurred in East Berlin, Connecticut.

## STATEMENT OF THE ISSUES

1. Whether the Court should summarily uphold the Board's uncontested
finding that the Company violated Section 8(a)(3) and (1) of the Act by
discharging  employee Vincent Davis for his union activity.

2. Whether the Board acted within its broad remedial discretion in ordering
the Company to reinstate Davis and make him whole.

---

1 "A" references are to the joint appendix.  "Br." references are to the Company's
opening brief.  Where applicable, references preceding a semicolon are to the
Board's decision; those following are to the supporting evidence.

2

# STATEMENT OF THE CASE

## I.  PROCEDURAL HISTORY

After investigating unfair-labor-practice charges filed by Davis and the International Association of Machinists and Aerospace Workers, AFL-CIO ("the Union"), the Board's General Counsel issued a complaint alleging that the Company violated Section 8(a)(3) and (1) of the Act (29 U.S.C. § 158(a)(3) and (1)) by discharging Davis because he engaged in union activity.  Following a hearing, an administrative law judge issued a decision and recommended order finding that the Company violated the Act as alleged.  (A. 282-87.)  The Company did not except to the judge's finding of a violation; it instead filed limited exceptions to the remedy.  (A. 263-75.)  On review, the Board found no merit to the Company's exceptions and adopted the judge's findings and recommended order, as modified.  (A. 278-81.)

## II. THE BOARD'S FINDINGS OF FACT

### A.     The Company's Operations and Organizational Structure

The Company manufactures industrial washing machines and dryers at its East Berlin, Connecticut facility.  (A. 282; 13.)  The Company's chairperson is Barbara Kirejczyk.  Her sons, Ed and Scott Kirejczyk, are the president and vice president of operations, respectively.  Their sister, Caroline Wojcicki, is the vice president of finance.  (A. 278, 282; 13, 121.)  At the time in question, the

3

engineering manager was Stephen Morris, and he reported to Ed Kirejczyk.  (A. 282; 14-15, 37.)  About 20 production employees work in the Company's factory, including one quality inspector.  (A. 14-15, 156.)

**B.    The Company Contracts with Westaff To Refer Candidates for Its Quality Inspector Position; the Company Selects Davis for the Position and He Begins Work**

In August 2013, the Company contracted with Westaff, a staffing agency, to screen and refer candidates for its quality inspector position, and, in the event that a Westaff candidate was hired, to provide payroll services for the hiree.  (A. 278, 282; 18-19, 71-72, 157-60.)  Westaff identified Davis as a candidate, and referred him to the Company.  (A. 278, 282; 20, 72, 87.)  The Company interviewed Davis twice, including assessing his performance on a skills test, and then selected him for the position.  (A. 278, 282; 20-22, 37-38, 73, 88, 127, 161-62, 164-65.)  The Company negotiated and ultimately determined Davis's wage rate.[2]  (A. 278, 282-83; 25, 73, 164, 201, 204.)

Davis began working for the Company in late September, reporting directly to Engineering Manager Morris.  (A. 283; 15, 20-21, 25, 86, 89, 156.)  Consistent with the terms of its contract with Westaff, the Company—through Morris and Vice President of Operations Scott Kirejczyk—supervised all aspects of Davis's

---

2 While Westaff was to provide the payroll services for Davis, the Company was responsible to pay Westaff for all wages that Westaff paid to Davis, plus a markup. (A. 282-83; 78, 157-58, 164.)

job performance. Their supervision included overseeing and directing his job assignments, training him, and evaluating his work. (A. 278, 283; 20-21, 32, 89, 158, 164.) The Company promised Davis that it would increase his wage rate at specified intervals, depending on its evaluation of his performance. (A. 278, 283; 164, 204.)

### C. Davis Has a Disagreement with President Kirejczyk about Holiday Pay; the Company Decides To Evaluate His Performance

Soon after he started work, Davis began advocating to receive holiday pay for the upcoming holidays. (A. 283; 25, 39.) He raised the issue with Morris and Scott Kirejczyk, but was told that the Company did not provide such benefits to new employees. (A. 283; 25, 39, 172.) Scott Kirejczyk privately suggested to his brother that the Company offer Davis a compromise regarding holiday pay, but Ed rejected the idea. (A. 283; 25, 172.)

On October 22, Davis spoke to Ed Kirejczyk and asked to be given holiday pay. (A. 279, 283; 92.) Ed denied the request. (A. 279, 283; 92.) During their discussion, Davis said that if the Company treated its employees better, it would have a better chance of retaining them. (A. 279, 283; 92.) At the end of the conversation, Davis commented, "you get what you give." (A. 279, 283; 92.)

Later on October 22, the Company's managers held a meeting where they discussed, among other topics, Davis's request for holiday pay. (A. 283; 40.) President Kirejczyk related his earlier conversation with Davis. (A. 283; 41.) The

managers agreed that Morris would formally evaluate Davis's performance and, depending on the result, they might give him holiday pay.  (A. 283; 40, 42.)

### D. Davis Contacts the Union and Attempts To Organize His Coworkers

Also on October 22, Davis contacted the Union and expressed his interest in organizing the Company's employees.  (A. 283; 64-65, 88, 207-08.)  Over the following days, Davis discussed the possibility of union representation with coworkers, and he arranged for a meeting with a union representative at a local restaurant on October 28.  (A. 283; 64-65, 88-89.)  During that meeting, the representative, Davis, and four other employees discussed how to obtain union representation.  (A. 283; 65, 89.)  The employees signed union authorization cards, and agreed to solicit additional cards from coworkers.  (A. 283-84; 65-66, 89.) The following day, October 29, Davis and another employee solicited and obtained additional cards from other workers.  (A. 284; 43-44, 89-90.)

### E. The Company Gives Davis a Positive Performance Evaluation; Within Hours, It Discharges Him Because of His Union Activity; Several Days Later, the Company Learns of Davis's Criminal Record

Also on October 29, Morris finalized his written performance evaluation of Davis, which was positive.  (A. 284; 42-43.)  Morris informed Davis of the positive assessment, and told him that he was meeting all of the Company's expectations.  (A. 284; 42, 89.)

6

Later that day, Vice President of Operations Scott Kirejczyk told a group of managers, including Ed Kirejczyk and Morris, that Davis would no longer be working for the Company because he was involved in union organizing efforts. (A. 284; 43-44, 57-58.)  Scott related that another employee had reported the union organizing, and that Davis was its leader. (A. 43-44, 58.)  Ed Kirejczyk proposed delaying Davis's termination for about a week, in order to monitor his activity and gather intelligence to find out who else was involved in the organizing. (A. 44, 58.)  Ultimately, however, the Kirejczyk brothers agreed that Davis should be terminated immediately. (A. 44, 57-58.)

Accordingly, Scott Kirejczyk told Westaff that Davis should not come to work the next day, October 30, and that the Company no longer needed his services. (A. 278, 284; 26-27, 42, 76, 181.)  Westaff promptly relayed this message to Davis. (A. 284; 76, 90, 202.)

Over the following days, Davis sent Morris several emails and text messages asking about the reason for his termination. (A. 279; 44, 46, 90, 202-04.)  On November 5, Morris informed the Kirejczyk brothers and their sister, Vice President of Finance Caroline Wojcicki, that Davis had been attempting to contact him. (A. 279; A. 44-45, 58.)  The same day, Wojcicki did an internet search and discovered that Davis had a criminal record; she shared this information with the other managers. (A. 279, 284; A. 40, 45-46, 56.)  Davis had been incarcerated for

7

nine months in 2011-2012 after pleading guilty to a Connecticut weapons-related felony charge. (A. 279, 282; 87, 98, 182.) The Company did not know about Davis's criminal record prior to November 5. (A. 279, 284; A. 22, 30, 38, 45-46, 56, 76, 88, 91, 182-83, 187-89.) In the past it had hired, and it continues to employ, workers with felony convictions and other criminal records. (A. 279, 284; 33, 38, 179, 193-200.)

### III. THE BOARD'S CONCLUSIONS AND ORDER

On the foregoing facts, the Board (Members Miscimarra, Hirozawa, and Johnson) affirmed, in the absence of exceptions, the administrative law judge's finding that the Company violated Section 8(a)(3) and (1) of the Act by discharging Davis for his union activity. (A. 278, 278 n.1.) The Board's Order requires the Company to cease and desist from the unfair labor practices found, and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights under the Act. Affirmatively, the Order requires the Company to expunge all references to the unlawful discharge from its files and to post a remedial notice. The Order also requires the Company to offer Davis reinstatement and make him whole. (A. 280-81.) In directing reinstatement and make-whole relief, the Board rejected the Company's claims that it was not an

employer of Davis, and that it would have discharged him upon learning about his criminal record.[3]  (A. 278-79.)

## SUMMARY OF ARGUMENT

The Court should summarily affirm the Board's uncontested finding that the Company violated Section 8(a)(3) and (1) of the Act by discharging Davis for his union activity, and summarily enforce the unchallenged aspects of its Order.  As to the challenged portions of the Order, the Board acted well within its broad remedial discretion in requiring the Company to reinstate Davis and make him whole.

To begin, the Board reasonably rejected the Company's argument that it was not an employer of Davis and therefore should not be made to reinstate him. Given the uncontroverted evidence that the Company alone selected and trained Davis, supervised, directed, and evaluated every aspect of his performance, determined his wage rate, and ultimately discharged him for his union activity, the Board reasonably found that the Company was an employer of Davis within the meaning of the Act.  Accordingly, the Board properly exercised its broad remedial authority in ordering the Company to reinstate him.  That is the conventional

---

3 Before the Board, the Company also contended that it would have discharged Davis on about June 9, 2014, when it first saw the employment application he had submitted to Westaff.  The application did not disclose his criminal record.  (A. 27, 74, 218-23, 264, 271.)  The Board declined to pass on the merits of this issue, determining that it should be addressed at the compliance stage.  (A. 279-80.) Accordingly, the issue is not before the Court.

remedy for an employer's unlawful discharge of an employee for engaging in union activity.

Further, the Company failed to meet its burden of establishing its claim that Davis's right to reinstatement should have been extinguished, and his make-whole relief limited, when the Company learned, a week after his discharge, that he had a criminal record. The Company concedes that it hires and employs convicted felons, but asserts that it would have discharged Davis upon discovering his conviction because he purportedly had also threatened President Ed Kirejczyk during a conversation about holiday pay a week before his termination. The Board, however, reasonably found that Davis's actual remark—"you get what you give"—was not objectively threatening. In challenging this finding, the Company erroneously relies on Ed Kirejczyk's discredited testimony that Davis also told him, "I'm going to get you." Moreover, the Company's subsequent actions—its decision not to discipline Davis for his remark, and to write up an evaluation possibly acceding to his request for holiday pay, as well as Ed Kirejczyk's later proposal to delay Davis's unlawful discharge so the Company could observe workers' union activity —belie its assertion that it viewed Davis's remark as threatening. In these circumstances, the Board reasonably found that the Company failed to satisfy its burden of showing that Davis engaged in misconduct for which

10

it would have discharged any employee.  Accordingly, the Board's Order should

be enforced in full.

## ARGUMENT

### I. THE COURT SHOULD SUMMARILY UPHOLD THE BOARD'S UNCONTESTED FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(3) AND (1) OF THE ACT BY DISCHARGING DAVIS FOR HIS UNION ACTIVITY

The Board found (A. 278, 284) that the Company violated Section 8(a)(3)

and (1) of the Act by discharging Davis because he was involved in union

organizing.  (A. 284.)  *See*, *e.g.*, *Torrington Extend-A-Care Employee Ass'n v.*

*NLRB*, 17 F.3d 580, 591 (2d Cir. 1994) ("Firing . . . an employee[] . . . on account

of that employee's union activities violates Section 8(a)(3) and (1) of the Act.");

*NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 957 (2d Cir. 1988) (same).  As the Board

noted (A. 278), the Company did not except to the judge's finding that it

unlawfully discharged Davis; instead, it limited its exceptions to certain aspects of

the judge's recommended remedy.

Section 10(e) of the Act provides in relevant part: "No objection that has not

been urged before the Board . . . shall be considered by the court, unless the failure

or neglect to urge such objection shall be excused because of extraordinary

circumstances."  29 U.S.C. § 160(e).  Courts of appeals "lack[] jurisdiction to

review objections that were not urged before the Board." *Woelke & Romero*

11

*Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982). *Accord Elec. Contractors, Inc.*

*v. NLRB*, 245 F.3d 109, 115 (2d Cir. 2001).

The Company never claimed, nor could it, that "extraordinary

circumstances" excused its failure to except to the judge's finding that it

unlawfully discharged Davis. Accordingly, Section 10(e) of the Act

jurisdictionally bars the issue from this Court's review. *Woelke*, 456 U.S. at 666;

*Elec. Contractors*, 245 F.3d at 115. Moreover, the Company waived the issue by

failing to raise it in its opening brief to this Court. *LoSacco v. City of Middletown*,

71 F.3d 88, 92-93 (2d Cir. 1995) (issues not raised in opening brief on appeal are

deemed abandoned); Fed. R. App. P. 28(a)(8) (appellant's opening brief must

include "[its] contentions and the reasons for them, with citations to the authorities

and parts of the record on which [it] relies").

As a result, the Court should summarily affirm the Board's finding that the

Company unlawfully discharged Davis in violation of Section 8(a)(3) and (1) of

the Act. Moreover, the Board is entitled to summary enforcement of the

unchallenged aspects of its Order. *NLRB v. Consol. Bus Transit, Inc.*, 577 F.3d

467, 474 n.2 (2d Cir. 2009); *Torrington*, 17 F.3d at 590, 596.

## II.   THE BOARD ACTED WITHIN ITS BROAD REMEDIAL DISCRETION IN ORDERING THE COMPANY TO REINSTATE DAVIS AND MAKE HIM WHOLE

### A.   Applicable Principles and Standard of Review

Section 10(c) of the Act empowers the Board to order the perpetrator of an unfair labor practice to cease and desist from the violation found and "to take such affirmative action . . . as will effectuate the policies" of the Act.  29 U.S.C. § 160(c).  This statutory command "vest[s] in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review."  *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898-99, (1984).  *Accord Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964); *Elec. Contractors, Inc. v. NLRB*, 245 F.3d 109, 123 (2d Cir. 2001).  Consequently, a Board order must not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act."  *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943).  *Accord ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324, 324 n.10 (1994); *Consol. Bus*, 577 F.3d at 476; *Elec. Contractors*, 245 F.3d at 123.

To the extent that the Board's factual findings are before the Court, they are "conclusive" if supported by substantial evidence on the record as a whole.  29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-85 (1951).  In other words, the Court will overturn such a finding only if it concludes that "no

13

rational trier of fact could reach the conclusion drawn by the Board." *Consol. Bus*, 577 F.3d at 474. Moreover, Board findings that are rooted in the administrative law judge's credibility determinations will not be reversed unless they are "hopelessly incredible or . . . flatly contradict either the law of nature or undisputed documentary testimony." *NLRB v. Am. Geri-Care, Inc.*, 697 F.2d 56, 60 (2d Cir. 1982) (quotation marks omitted). *Accord NLRB v. Thalbo Corp.*, 171 F.3d 102, 112 (2d Cir. 1999).

The Company raises two challenges to the Board's remedy. First, it contends that it was not Davis's employer, and therefore that the Board abused its discretion in ordering it to reinstate him. Second, the Company argues that the Board should have cut off Davis's right to reinstatement and make-whole relief on November 5, when it learned about his criminal record. As shown below, the Board reasonably rejected both claims.

### B. The Board Reasonably Found that the Company Was an Employer of Davis and Properly Ordered It To Reinstate Him

Section 2(2) of the Act (29 U.S.C. § 152(2)) broadly defines the term "employer" as including "any person acting as an agent of an employer, directly or indirectly," subject only to certain narrow exemptions not applicable here. *See NLRB v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537, 542-43 (6th Cir. 2015) ("The [Act] defines . . . 'employer' in general and expansive

14

terms.").  Construing and applying the term is part of the Board's delegated, expert

function, and its determinations in that regard are "entitled to great respect."  *NLRB*

*v. E.C. Atkins & Co.*, 331 U.S. 398, 403 (1947).  *Accord NLRB v. Young Women's*

*Christian Ass'n of Metro. St. Louis*, 192 F.3d 1111, 1116 (8th Cir. 1999).

The Board has found an entity to be an "employer" under the Act if it

"controls some matters relating to the employment relationship."  *Recana*

*Solutions*, 349 NLRB 1163, 1164-65 (2007).  *Accord Mgmt. Training Corp.*, 317

NLRB 1355, 1358 (1995).  Whether another entity may also control aspects of the

employment relationship is irrelevant.  *Verizon*, 350 NLRB 542, 542, 565-66

(2007) (entity was "an employer" of workers without regard to whether a separate

entity might have been their joint employer); *Recana*, 349 NLRB at 1164-65 (one

entity's employment relationship with workers not nullified by fact that another

entity "controls many aspects of the [workers'] employment"); *Mgmt. Training*,

317 NLRB at 1357-58 (entity may be employer of employees even if distinct entity

"controls most of the employees' terms and conditions of employment").

Here, as the Board reasonably found, "the record establishes that the

[Company] was *an* employer of Davis, because it exercised sufficient control over

his terms and conditions of employment."  (A. 278) (emphasis in original).  The

Company interviewed Davis and assessed his skills, selected him for the position,

and determined his wage rate.  Once he began work, the Company alone

15

supervised all of his assignments, trained him, directed his work, and evaluated his performance. Indeed, as the Board noted (A. 278), the Company's contract with Westaff expressly charged it with supervising Davis; it required the Company to "exercise good judgment and management relating to . . . day-to-day supervision" and to "provide appropriate supervision and training." (A. 158).

Further, the Company promised Davis that it would increase his wage rate based on its evaluation of his performance, and it later evaluated him for the purpose of determining whether to grant him holiday pay. Additionally, the Company unilaterally terminated Davis's tenure as a quality inspector at its facility. These factors are hallmarks of an employer-employee relationship, and the Company does not contend otherwise. Thus, the Company unquestionably controlled key "matters relating to the employment relationship," and was a statutory employer of Davis. *See, e.g.*, *Verizon*, 350 NLRB at 542, 565-66 (entity was an employer of employees where it interviewed and hired workers, disciplined and trained them, and determined their wage rates, overtime, and work schedules); *Recana*, 349 NLRB at 1164-65 (entity was an employer of employees where it selected applicants for positions and set their wage rates).

As the Company was an employer of Davis, the Board properly exercised its broad remedial authority in ordering it to reinstate him. (A. 278.) To begin, the Company did not challenge the judge's finding that it violated Section 8(a)(3) and

16

(1) of the Act by discharging Davis, and it has long been settled that reinstatement is part of the conventional remedy for an unlawful discharge. *NLRB v. Int'l Van Lines*, 409 U.S. 48, 53 (1972) (Board order requiring employer to reinstate with backpay unlawfully discharged employees was "proper" and "clearly within the Board's authority"); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 187, 197 (1941) ("Reinstatement is the conventional correction for discriminatory discharges," and "[m]aking . . . workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces"). Indeed, as this Court has explained, an award of reinstatement with backpay is a "proper and accepted remed[y] for violations of Sections 8(a)(1) and 8(a)(3)" (*NLRB v. Better Val-U Stores of Mansfield, Inc.*, 401 F.2d 491, 493 (2d Cir. 1968)), and "the normal remedy awarded to victims of discrimination [under the Act]." *G & T Terminal Packaging Co. Inc. v. NLRB*, 459 F. App'x 19, 21 (2d Cir. 2012)).

Consistent with this bedrock principle, the Board requires firms that unlawfully discharge or lay off employees supplied by a third party to reinstate them and make them whole, where the user firms are an employer of those individuals. *See*, *e.g.*, *D&F Indus., Inc.*, 339 NLRB 618, 618, 618 n.5, 623-24, 639-40, 646-49 (2003) (ordering manufacturer to reinstate unlawfully laid off employees supplied by staffing agency, where manufacturer was an employer of

17

those employees); *Skill Staff of Colorado*, 331 NLRB 815, 815-16, 819, 821 (2000) (ordering construction firm to reinstate unlawfully discharged employee supplied by staffing agency, where firm was an employer of that employee).

The Company's limited challenges to the Board's reinstatement order are unavailing.[4] It errs in relying on *Vemco, Inc.*, 314 NLRB 1235 (1994), *enforcement denied on other grounds*, 79 F.3d 526 (6th Cir. 1996), and *Huck Store Fixture Co.*, 334 NLRB 119 (2001), *enforced*, 327 F.3d 528 (7th Cir. 2003). To be sure, in those cases the Board did not require the user firms to reinstate workers supplied by a third-party staffing agency. As the Board explained here, however, those cases are inapposite because "there was no finding that the user firm was [the agency workers'] employer." (A. 279 n.3.) By contrast, in the present case the Board squarely found that the Company, like the user firms in *D&F Industries* and *Skill Staff*, was an employer of the workers in question. Indeed, the Company expressly acknowledges (Br. 20) this crucial distinction between the present case, *D&F Industries*, and *Skill Staff*, on the one hand, and *Vemco* and *Huck* on the other.

The Company likewise misses the mark in noting (Br. 21) that in *D&F Industries* and *Skill Staff*, the supplier firms were also respondents, and were found

---

4 In contending that it was not an employer of Davis, the Company does not challenge his entitlement to make-whole relief. Rather, it concedes (Br. 21) that such relief is appropriate, and contests only its duty to reinstate him.

18

to be joint employers with the user firms. In both cases, the user firm was undeniably found to be *an* employer of the relevant employees. Moreover, the user firm's reinstatement obligation was in no way conditioned on the supplier firm's separate liability. Indeed, in *D&F Industries*, the Board ordered the user firm to reinstate the discriminatees even though the supplier firm had lost its contract with the user. *See* 339 NLRB at 649 n. 86.

"Ordering effective relief in a case of this character promotes a vital public interest." *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 325 (1994). To that end, the Board appropriately ordered its conventional reinstatement remedy. The Board's reinstatement order should not be disturbed, as the Company has not shown that it is "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec.*, 319 U.S. at 540.

### C. The After-Acquired Evidence Concerning Davis's Criminal Record Did Not Compel the Board To Limit the Remedy

The Company admits (Br. 17) that it was not aware of Davis's criminal record until November 5, several days after it discharged him. It also does not dispute (Br. 6) the settled point that such after-acquired evidence has no bearing on the lawfulness of a discharge. *Tel Data Corp.*, 315 NLRB 364, 367 (1994), *enforced in relevant part*, 90 F.3d 1195 (6th Cir. 1996). Although the Board may alter its remedial order based on after-acquired evidence, the employer bears the burden of proving that such action is warranted. *Mohave Elec. Co-op., Inc. v.*

19

*NLRB*, 206 F.3d 1183, 1192 (D.C. Cir. 2000); *Frazier Indus. Co. v. NLRB*, 213 F.3d 750, 760 (D.C. Cir. 2000); *Berkshire Farm Ctr. & Servs. for Youth*, 333 NLRB 367, 367 (2001); *Tel Data*, 315 NLRB at 367.  *See also 10 Ellicott Square Court Corp.*, 320 NLRB 762, 771-72, 777 (1996), *enforced*, 104 F.3d 354 (2d Cir. 1996).

Specifically, an employer that seeks to limit the remedy owed to an unlawfully discharged employee based on after-acquired evidence must prove that the employee engaged in misconduct for which it "*would* have discharged any employee."  *Mohave*, 206 F.3d at 1192 (emphasis in original).  *Accord Frazier*, 213 F.3d at 760; *Berkshire*, 333 NLRB at 367.  It does not suffice merely to show that misconduct occurred, and that the employer *could* have discharged the employee for it.  *Mohave*, 206 F.3d at 1192; *Frazier*, 213 F.3d at 760. Furthermore, since the employer in this context has already been found guilty of unlawful discrimination against the discharged employee, its claims regarding after-acquired evidence should be "examined . . . with great care, and with no small amount of suspicion."  *Mojave Elec. Coop., Inc.*, 327 NLRB 13, 18 (1998), *enforced*, 206 F.3d 1183 (D.C. Cir. 2000).  If the employer satisfies its burden, the Board will deny reinstatement and terminate backpay on the date that the employer discovered the misconduct.  *Berkshire*, 333 NLRB at 367.

Here, the Company utterly failed to meet its burden of showing that Davis engaged in misconduct for which it would have discharged any employee. Initially, as the Company rightly concedes: "[i]t is undisputed that [the Company] has employed and continues to employ convicted felons at its factory." (Br. 16.) Accordingly, the Company has never claimed, nor could it, that it would have discharged Davis based solely on discovering his felony record, as the Board expressly noted. (A. 279 n.4.) Instead, the Company contends (Br. 15-19) that it would have discharged Davis upon learning of his criminal history because he purportedly had threatened President Ed Kirejczyk with violence two weeks earlier, on October 22.

The Board, however, reasonably found (A. 279, 283) that the statement in question was not objectively threatening. As the Company appears to recognize (Br. 3, 10, 14-15, 22), this is the appropriate inquiry. *See, e.g.*, *CF Taffe Plumbing Co., Inc.*, 357 NLRB No. 165, 2011 WL 7427787, at *16-*17 (Dec. 30, 2011) (examining whether discharged employee's statements objectively threatening); *Hadco Aluminum & Metal Corp.*, 331 NLRB 518, 521 (2000) (same); *Briar Crest Nursing Home*, 333 NLRB 935, 937-38 (2001) (same with respect to striker's statements). Here, the credited evidence shows that Davis concluded his October 22 conversation with President Kirejczyk by saying: "You get what you give." (A. 279, 283.) As the Board found (A. 279, 283), this comment could not reasonably

21

be regarded as a threat of violence, particularly when considered in context. After all, as the Board noted, the discussion concerned Davis's ineligibility for holiday pay, the Company's difficulty with retaining employees, and Davis's suggestion that morale would improve if the Company treated employees better. (A. 279, 283.) Thus, as the Board noted, the context of their conversation makes it even clearer that Davis's remark "referred to the likelihood that employee retention would improve if employees were afforded better terms and conditions of employment." (A. 279.) Further, as Davis testified, he spoke in a calm tone and did not raise his voice during this conversation.[5] (A. 92, 95.)

The Company bases its challenge to the Board's findings about Davis's October 22 remark on Ed Kirejczyk's discredited version of it. It blithely asserts (Br. 12)—without even acknowledging that Ed's testimony was discredited—that Davis said: "You get what you give, and I'm going to get you." Yet, the judge's decision (affirmed by the Board) to discredit Ed's testimony is not even before the Court, because the Company did not challenge it in its exceptions before the Board, or in its opening brief on appeal. *See* A. 263-75, Br. 1-22. *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666, (1982); *LoSacco v. City of*

---

5 The Company errs in relying (Br. 14) on the judge's characterization of Davis as "aggressively pursuing" holiday pay. The Board (A. 279 n.5) expressly "disavow[ed] the judge's commentary" about this purported aggression. Accordingly, the judge's comments are not part of the Board decision under review.

*Middletown*, 71 F.3d 88, 92-93 (2d Cir. 1995). Moreover, even if the issue were

properly presented for review, the Company could not possibly show that the

judge's credibility ruling was "hopelessly incredible or . . . [that it] flatly

contradict[s] either the law of nature or undisputed documentary testimony."

*NLRB v. Am. Geri-Care, Inc.*, 697 F.2d 56, 60 (2d Cir. 1982) (quotation marks

omitted). Notably, neither Morris nor Scott Kirejczyk testified that Ed told them

Davis had said he was "going to get" Ed. To the contrary, Morris testified that

when Ed related his conversation with Davis to the other managers, Ed said that

Davis simply told him "you get what you give." (A. 41.) Thus, Morris's

testimony corroborates Davis's and supports the Board's finding that Davis did not

threaten Ed Kirejczyk.

There is no more merit to the Company's further claim (Br. 7, 12-14) that Ed

Kirejczyk nevertheless subjectively felt threatened by Davis's remark. This claim

is unavailing, not only because Ed's supposed perception is founded on his

discredited claim about what Davis said, but also because the appropriate standard

is an objective one. *See* p. 21 above.

Moreover, the Company's actions amply demonstrate that it, and Ed

Kirejczyk in particular, did not in fact view Davis's October 22 remark as a threat

of violence. After all, as the Board noted, the Company decided that the remark

did not warrant discipline. (A. 283-84.) To the contrary, when Ed told the other

23

managers about his conversation with Davis, they responded by "agree[ing] that Morris should write up an evaluation of Davis with the possibility of giving in to [his] demand for holiday pay." (A. 283.) Moreover, when company officials decided to discharge Davis because of his union activity, Ed urged them to keep Davis on for another week before terminating him. This course of conduct is patently inconsistent with the Company's claim that it believed Davis had threatened physical violence.

In furtherance of its failed attempt to show it was genuinely alarmed by the combined effect of Davis's October 22 remark and its November 5 discovery of his prior conviction, the Company also notes (Br. 7, 15) that around this time, Davis sent Morris a series of emails and texts asking about the reason for his discharge. The Company (Br. 7-8, 15-16, 18-19) cites Morris's testimony that Davis's missives, in combination with the discovery of his criminal record, caused Morris to feel concern for his safety and prompted Vice President Wojcicki to call the police. (A. 44-45, 56.) As the Board found (A. 279 n.6), however, and as the Company admits (Br. 8, 18), the texts and emails were neither threatening nor harassing. As the Board also noted (D&O 2 n.6), there is no evidence that Morris's feelings or Wojcicki's phone call had anything to do with Davis's purported remark on October 22. Moreover, as noted above at p. 21, the Company never claimed that it would have fired Davis based solely on its discovery of his

24

criminal record. To the contrary, it admits that it employs felons and "may have hired Davis had [it] been aware of his conviction for a weapon related felony." (Br. 16-17.)

In view of the Board's reasonable finding that Davis's October 22 comment was not objectively threatening, and that the Company did not in fact consider it to be so, together with the undisputed fact that it employs convicted felons, the Board was clearly on solid footing in finding that the Company's after-acquired knowledge of Davis's criminal record "[did] not reasonably transform the 'you get what you give' statement into grounds for which [it] would have discharged [him] absent his union activity." (A. 279.) That is to say, the Company failed to meet its burden of establishing that Davis engaged in misconduct for which it "*would* have discharged any employee." *Mohave*, 206 F.3d at 1192 (emphasis in original). This failure of proof is underscored by the Company's single-minded reliance on a discredited version of Davis's October 22 remark, and by the total absence of any testimony that it would have discharged Davis based on a combination of his remark and his prior conviction. The Company's "bare assertion" does not suffice to meet its burden. *Frazier*, 213 F.3d at 760. *Accord Beverly California Corp.*, 339 NLRB 776, 777 n.9 (2003) ("speculat[ion]" does not meet burden).

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court enter a judgment denying the petition for review and enforcing the Board's Order in full.

Respectfully submitted,

/s/ Julie B. Broido
JULIE B. BROIDO
*Supervisory Attorney*

/s/ Michael R. Hickson
MICHAEL R. HICKSON
*Attorney*
*National Labor Relations Board*
1015 Half Street SE
Washington, DC 20570
(202) 273-2996
(202) 273-2985

RICHARD F. GRIFFIN, JR.
    *General Counsel*

JENNIFER ABRUZZO
    *Deputy General Counsel*

JOHN H. FERGUSON
    *Associate General Counsel*

LINDA DREEBEN
    *Deputy Associate General Counsel*

National Labor Relations Board
December 2015

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT


| | | |
|---|---|---|
| EDRO CORPORATON d/b/a DYNAWASH | ) | |
| | ) | Nos. 15-1451 & 15-1760 |
| Petitioner/Cross-Respondent | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD | ) | Board Case No. |
| | ) | 01-CA-116211 |
| Respondent/Cross-Petitioner | ) | |
| | ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the Board

certifies that its brief contains 5,869 words of proportionally spaced, 14-point type,

and the word-processing system used was Microsoft Word 2010.


s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570
(202) 273-2960


Dated at Washington, DC
this 16th day of December, 2015

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**


| | | |
|---|---|---|
| EDRO CORPORATON d/b/a DYNAWASH | ) | |
| | ) | Nos. 15-1451 & 15-1760 |
| Petitioner/Cross-Respondent | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD | ) | Board Case No. |
| | ) | 01-CA-116211 |
| Respondent/Cross-Petitioner | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2015, I electronically filed the

foregoing with the Clerk of the Court for the United States Court of Appeals for

the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 16th day of December, 2015